Justice Thomas
delivered the opinion of the Court.
This case involves an employer’s claims against a local union and the union’s international parent for economic dam *292 ages arising out of a 2004 strike. The claims turn in part on whether a collective-bargaining agreement (CBA) containing a no-strike provision was validly formed during the strike period. The employer contends that it was, while the unions contend that it was not. Because the CBA contains an arbitration clause, we first address whether the parties’ dispute over the CBA’s ratification date was a matter for the District Court or an arbitrator to resolve. We conclude that it was a matter for judicial resolution. Next, we address whether the Court of Appeals erred in declining the employer’s request to recognize a new federal cause of action under § 301(a) of the Labor Management Relations Act, 1947 (LMRA), 61 Stat. 156, 29 U. S. C. § 185(a), for the international union’s alleged tortious interference with the CBA. The Court of Appeals did not err in declining this request.
I
Petitioner Granite Rock Company is a concrete and building materials company that has operated in California since 1900. Granite Rock employs approximately 800 employees under different labor contracts with several unions, including respondent International Brotherhood of Teamsters, Local 287' (Local). Granite Rock and Local were parties to a 1999 CBA that expired in April 2004. The parties’ attempt to negotiate a new CBA hit. an impasse and, on June 9, 2004, Local members initiated a strike in support of their contract demands.[1]
The strike continued until July 2, 2004, when the parties reached agreement on the terms of a new CBA. The CBA *293 contained a no-strike clause but did not directly address union members’ liability for any strike-related damages Granite Rock may have incurred before the new CBA was negotiated but after the prior CBA had expired. At the end of the negotiating session on the new CBA, Local’s business representative, George Netto, approached Granite Rock about executing a separate “back-to-work” agreement that would, among other things, hold union members harmless for damages incurred during the June 2004 strike. Netto did not make execution of such an agreement a condition of Local’s ratification of the CBA, or of Local’s decision to cease picketing. Thus, Local did not have a back-to-work or hold-harmless agreement in place when it voted to ratify the CBA on July 2, 2004.
Respondent IBT, which had advised Local throughout the CBA negotiations and whose leadership and .members supported the June strike, opposed Local’s decision to return to work without a back-to-work agreement shielding both Local and IBT members from liability for strike-related damages. In an effort to secure such an agreement, IBT instructed Local’s members not to honor their agreement to return to work on July 5, and instructed Local’s leaders to continue the work stoppage until Granite Rock agreed to hold Local and IBT members free from liability for the June strike. Netto demanded such an agreement on July 6, but Granite Rock refused the request and informed Local that the company would view any continued strike activity as a violation of the new CBA’s no-strike clause. IBT and Local responded by announcing a companywide strike that involved numerous facilities and hundreds of workers, including members of IBT locals besides Local 287.
According to Granite Rock, IBT not only instigated this strike; it supported and directed it. IBT provided pay and benefits to union members who refused to return to work, directed Local’s negotiations with Granite Rock, supported Local financially during the strike period with a $1.2 million *294 loan, and represented to Granite Rock that IBT had unilateral authority to end the work stoppage in exchange for a hold-harmless agreement covering IBT members within and outside Local’s bargaining unit.
On July 9, 2004, Granite Rock sued IBT and Local in the District Court, seeking an injunction against the ongoing strike and strike-related damages. Granite Rock’s complaint, originally and as amended, invoked federal jurisdiction under LMRA § 301(a), alleged that the July 6 strike violated Local’s obligations under the CBA’s no-strike provision, and asked the District Court to enjoin the strike because the hold-harmless dispute giving rise to the strike was an arbitrable grievance. See Boys Markets, Inc. v. Retail Clerks, 398 U. S. 235, 237-238, 253-254 (1970) (holding that federal courts may enjoin a strike where a CBA contemplates arbitration of the dispute that occasions the strike). The unions conceded that LMRA § 301(a) gave the District Court jurisdiction over the suit but opposed Granite Rock’s complaint, asserting that the CBA was not validly ratified on July 2 (or at any other time relevant to the July 2004 strike) and, thus, its no-strike clause did not provide a basis for Granite Rock’s claims challenging the strike.
The District Court initially denied Granite Rock’s request to enforce the CBA’s no-strike provision because Granite Rock was unable to produce evidence that the CBA was ratified on July 2. App. 203-213. Shortly after the District Court ruled, however, a Local member testified that Netto had put the new CBA to a ratification vote on July 2, and that the voting Local members unanimously approved the agreement. Based on this statement and supporting testimony from 12 other employees, Granite Rock moved for a new trial on its injunction and damages claims.
On August 22, while that motion was pending, Local conducted a second successful “ratification” vote on the CBA, and on September 13, the day the District Court was scheduled to hear Granite Rock’s motion, the unions called off *295 their strike. Although their return to work mooted Granite Rock’s request for an injunction, the District Court proceeded with the hearing and granted Granite Rock a new trial on its damages claims. The parties proceeded with discovery, and Granite Rock amended its complaint, which already alleged federal[2] claims for breach of the CBA against both Local and IBT, to add federal inducement of breach and interference with contract (hereinafter tortious interference) claims against IBT.
IBT and Local both moved to dismiss. Among other things, IBT argued that Granite Rock could not plead a federal tort claim under § 301(a) because that provision supports a federal cause of action only for breach of contract. The District Court agreed and dismissed Granite Rock’s tortious interference claims. The District Court did not, however, grant Local’s separate motion to send the parties’ dispute over the CBA’s ratification date to arbitration.[3] The District Court held that whether the CBA was ratified on July 2 or August 22 was an issue for the court to decide, and submitted the question to a jury. The jury reached a unanimous verdict that Local ratified the CBA on July 2, 2004. The District Court entered the verdict and ordered the parties to proceed with arbitration on Granite Rock’s breach-of-contract claims for strike-related damages.
The Court of Appeals for the Ninth Circuit affirmed in part and reversed in part. See 546 F. 3d 1169 (2008). The Court of Appeals affirmed the District Court’s dismissal of Granite Rock’s tortious interference claims against IBT. See id., at 1170-1175. But it disagreed with the District *296 Court’s determination that the date of the CBA’s ratification was a matter for judicial resolution. See id., at 1176-1178. The Court of Appeals reasoned that the parties’ dispute over this issue was governed by the CBA’s arbitration clause because the clause clearly covered the related strike claims,, the “national policy favoring arbitration” required that any ambiguity about the scope of the parties’ arbitration clause be resolved in favor of arbitrability, and, in any event, Granite Rock had “implicitly” consented to arbitrate the ratification-date dispute “by suing under the contract.” Id., at 1178 (internal quotation marks omitted). We granted certiorari. 557 U. S. 933 (2009).
II
It is well settled in both commercial and labor cases that whether parties have agreed to “submi[t] a particular dispute to arbitration” is typically an “ ‘issue for judicial determination.’” Howsam v. Dean Witter Reynolds, Inc., 537 U. S. 79, 83 (2002) (quoting AT&T Technologies, Inc. v. Communications Workers, 475 U. S. 643, 649 (1986)); see John Wiley & Sons, Inc. v. Livingston, 376 U. S. 543, 546-547 (1964). It is similarly well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide. See, e. g., First Options of Chicago, Inc. v. Kaplan, 514 U. S. 938, 944 (1995) (“When deciding whether the parties agreed to arbitrate a certain matter ... courts generally . . . should apply ordinary . . . principles that govern the formation of contracts”); AT&T Technologies, supra, at 648-649 (explaining the settled rule in labor cases that “ ‘arbitration is a matter of contract’” and “arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration”); Buckeye Check Cashing, Inc. v. Cardegna, 546 U. S. 440, 444, n. 1 (2006) (distinguishing treatment of the generally nonarbitral question whether an arbitration agreement was “ever concluded” from the question whether a- *297 contract containing an arbitration clause was illegal when formed, which question we held to be arbitrable in certain circumstances).
These principles would neatly dispose of this case if the formation dispute here were typical. But it is not. It is based on when (not whether) the CBA that contains the parties’ arbitration clause was ratified and thereby formed.[4] And at the time the District Court considered Local’s demand to send this issue to an arbitrator, Granite Rock, the party resisting arbitration, conceded both the formation and the validity of the CBA’s arbitration clause.
These unusual facts require us to reemphasize the proper framework for deciding when disputes are arbitrable under our precedents. Under that framework, a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate that dispute. See First Options, supra, at 943; AT&T Technologies, supra, at 648-649. To satisfy itself that such agreement exists, the court must resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce. See, e.g., Rent-A-Center, West, Inc. v. Jackson, ante, at 68-70. Where there is no provision validly committing them to an arbitrator, see ante, at 71, these issues typically concern the scope of the arbitration clause and its enforceability. In addition, these issues always include whether the clause was agreed to, and may include when that agreement was formed.
A
The parties agree that it was proper for the District Court to decide whether their ratification dispute was arbitrable.[5] *298 They disagree about whether the District Court answered the question correctly. Local contends that the District Court erred in holding that the CBA’s ratification date was an issue for the court to decide. The Court of Appeals agreed, holding that the District Court’s refusal to send that dispute to arbitration violated two principles of arbitrability set forth in our precedents. See 546 F. 3d, at 1177-1178. The first principle is that where, as here, parties concede that they have agreed to arbitrate some matters pursuant to an arbitration clause, the “law’s permissive policies in respect to arbitration” counsel that “'any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration.’” First Options, supra, at 945 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U. S. 614, 626 (1985)); see 546 F. 3d, at 1177, n. 4, 1178 (citing this principle and the “national policy favoring arbitration” in concluding that arbitration clauses “are to be construed very broadly” (internal quotation marks omitted)). The second principle the Court of Appeals invoked is that this presumption of arbitrability applies even to disputes about the enforceability of the entire contract containing the arbitration clause, because at least in cases governed by the Federal Arbitration Act (FAA), 9 U. S. C. § 1 et seq.,[6] courts must *299 treat the arbitration clause as severable from the contract in which it appears, and thus apply the clause to all disputes within its scope “‘[ujnless the [validity] challenge is to the arbitration clause itself’ ” or the party “disputes the formation of [the] contract,” 546 F. 3d, at 1176 (quoting Buckeye, 546 U. S., at 445-446); 546 F. 3d, at 1177, and n. 4 (explaining that it would treat the parties’ arbitration clause as enforceable with respect to the ratification-date dispute because no party argued that the “clause is invalid in any way”).
Local contends that our precedents, particularly those applying the “‘federal policy favoring arbitration of labor disputes,”’ permit no other result. Brief for Respondent Local, p. 15 (quoting Gateway Coal Co. v. Mine Workers, 414 U. S. 368, 377 (1974)); see Brief for Respondent Local, at 10-13, 16-25. Local, like the Court of Appeals, overreads our precedents. The language and holdings on which Local and the Court of Appeals rely cannot be divorced from the first principle that underscores all of our arbitration decisions: Arbitration is strictly “a matter of consent,” Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ., 489 U. S. 468, 479 (1989), and thus “is a way to resolve those disputes — but only those disputes— that the parties have agreed to submit to arbitration,” First Options, 514 U. S., at 943 (emphasis added).[7] Applying this principle, our precedents hold that courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties’ arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue. Ibid. Where a party contests *300 either or both matters, “the court” must resolve the disagreement. Ibid.
Local nonetheless interprets some of our opinions to depart from this framework and to require arbitration of certain disputes, particularly- labor disputes, based on policy grounds even where evidence of the parties’ agreement to arbitrate the dispute in question is lacking. See Brief for Respondent Local, at 16 (citing cases emphasizing the policy favoring arbitration generally and the “impressive policy considerations favoring arbitration” in LMRA cases (internal quotation marks omitted)). That is not a fair reading of the opinions, all of which compelled arbitration of a dispute only after the Court was persuaded that the parties’ arbitration agreement was validly formed and that it covered the dispute in question and was legally enforceable. See, e. g., First Options, supra, at 944-945. That Buckeye and some of our cases applying a presumption of arbitrability to certain disputes do not discuss each of these requirements merely reflects the fact that in those cases some of the requirements were so obviously satisfied that no discussion was needed.
In Buckeye, the formation of the parties’ arbitration agreement was not at issue because the parties agreed that they had “concluded” an agreement to arbitrate and memorialized it as an arbitration clause in their loan contract. 546 U. S., at 444, n. 1. The arbitration clause’s scope was also not at issue, because the provision expressly applied to “‘[ajny claim, dispute, or controversy ... arising from or relating to . . . the validity, enforceability, or scope of this Arbitration Provision or the entire Agreement.’ ” Id., at 442. The parties resisting arbitration (customers who agreed to the broad arbitration clause as a condition of using Buckeye’s loan service) claimed only that a usurious interest provision in the loan agreement invalidated the entire contract, including the arbitration clause, and thus precluded the Court from relying on the clause as evidence of the parties’ consent to arbitrate *301 matters within its scope. See id., at 443. In rejecting this argument, we simply applied the requirement in §2 of the FAA that courts treat an arbitration clause as severable from the contract in which it appears and enforce it according to its terms unless the party resisting arbitration specifically challenges the enforceability of the arbitration clause itself, see id., at 443-445 (citing 9 U. S. C. § 2; Southland Corp. v. Keating, 465 U. S. 1, 4-5 (1984); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U. S. 395, 402-404 (1967)), or claims that the agreement to arbitrate was “[njever concluded,” 546 U. S., at 444, n. 1; see also Rent-A-Center, ante, at 70-71, and n. 2.
Our cases invoking the federal “policy favoring arbitration” of commercial and labor disputes apply the same framework. They recognize that, except where “the parties clearly and unmistakably provide otherwise,” AT&T Technologies, 475 U. S., at 649, it is “the court’s duty to interpret the agreement and to determine whether the parties intended to arbitrate grievances concerning” a particular matter, id., at 651. They then discharge this duty by: (1) applying the presumption of arbitrability only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand; and (2) adhering to the presumption and ordering arbitration only where the presumption is not rebutted. See id., at 651-652; Prima Paint Corp., supra, at 396-398; Gateway Coal, supra, at 374-377; Drake Bakeries Inc. v. Bakery Workers, 370 U. S. 254, 256-257 (1962); Atkinson v. Sinclair Refining Co., 370 U. S. 238, 241-242 (1962); Steelworkers v. Warrior & Gulf Nav. Co., 363 U. S. 574, 576 (1960).[8]
*302 Local is thus wrong to suggest that the presumption of arbitrability we sometimes apply takes courts outside our settled framework for deciding arbitrability. The presumption simply assists in resolving arbitrability disputes within that framework. Confining the presumption to this role reflects its foundation in “the federal policy favoring arbitration.” As we have explained, this “policy” is merely an acknowledgment of the FAA’s commitment to “overrule the judiciary’s longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts.” Volt, 489 U. S., at 478 (internal quotation marks and citation omitted). Accordingly, we have never held that this policy overrides the principle that a court may submit to arbitration “only those disputes ... that the parties have agreed to submit.” First Options, 514 U. S., at 948; see also Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U. S. 52, 57 (1995) (“[T]he FAA’s proarbitration policy does not operate without regard to the wishes of the contracting parties”); AT&T Technologies, 475 U. S., *303 at 650-651 (applying the same rule to the “presumption of arbitrability for labor disputes”)- Nor have we held that courts may use policy considerations as a substitute for party agreement. See, e. g., id., at 648-651; Volt, supra, at 478. We have applied the presumption favoring arbitration, in FAA and in labor cases, only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed and (absent a provision clearly and validly committing such issues to an arbitrator) is legally enforceable and best construed to encompass the dispute. See First Options, supra, at 944-945 (citing Mitsubishi, 473 U. S., at 626); Howsam, 537 U. S., at 83-84; AT&T Technologies, supra, at 650 (citing Warrior & Gulf, supra, at 582-583); Drake Bakeries, supra, at 259-260. This simple framework compels reversal of the Court of Appeals’ judgment because it requires judicial resolution of two questions central to Local’s arbitration demand: when the CBA was formed, and whether its arbitration clause covers the matters Local wishes to arbitrate.
B
We begin by addressing the grounds on which the Court of Appeals reversed the District Court’s decision to decide the parties’ ratification-date dispute, which the parties characterize as a formation dispute because a union vote ratifying the CBA’s terms was necessary to form the contract. See App. 351.[9] For purposes of determining arbitrability, *304 when a contract is formed can be as critical as whether it was formed. That is the case where, as here, the date on which an agreement was ratified determines the date the agreement was formed, and thus determines whether the agreement’s provisions were enforceable during the period relevant to the parties’ dispute.[10]
This formation-date question requires judicial resolution here because it relates to Local’s arbitration demand in such a way that the District Court was required to decide the CBA’s ratification date in order to determine whether the parties consented to arbitrate the matters covered by the demand.[11] The parties agree that the CBA’s arbitration clause pertains only to disputes that “arise under” the agreement. Accordingly, to hold the parties’ ratification-date dispute arbitrable, the Court of Appeals had to decide whether that dispute could be characterized as “arising under” the CBA. In answering this question in the affirmative, both Local and the Court of Appeals tied the arbitrability of the ratification-date issue — which Local raised as a defense to Granite Rock’s strike claims — to the arbitrability of the strike claims themselves. See id., at 347. They did so because the CBA’s arbitration clause, which pertains only to disputes “arising under” the CBA and thus presupposes the *305 CBA’s existence, would seem plainly to cover a dispute that “arises under” a specific substantive provision of the CBA, but does not so obviously cover disputes about the CBA’s own formation. Accordingly, the Court of Appeals relied upon the ratification dispute’s relationship to Granite Rock’s claim that Local breached the CBA’s no-strike clause (a claim the Court of Appeals viewed as clearly “arising under” the CBA) to conclude that “the arbitration clause is certainly ‘susceptible of an interpretation’ that covers” Local’s formation-date defense. 546 F. 3d, at 1177, n. 4.
The Court of Appeals overlooked the fact that this theory of the ratification dispute’s arbitrability fails if the CBA was not formed at the time the unions engaged in the acts that gave rise to Granite Rock’s strike claims. The unions began their strike on July 6, 2004, and Granite Rock filed its suit on July 9. If, as Local asserts, the CBA containing the parties’ arbitration clause was not ratified, and thus not formed, until August 22, there was no CBA for the July no-strike dispute to “arise under,” and thus no valid basis for the Court of Appeals’ conclusion that Granite Rock’s July 9 claims arose under the CBA and were thus arbitrable along with, by extension, Local’s formation-date defense to those claims.[12] See ibid. For the foregoing reasons, resolution of the parties’ dispute about whether the CBA was ratified in July or August was central to deciding Local’s arbitration demand. Accordingly, the Court of Appeals erred in holding that it was not necessary for the District Court to determine the CBA’s ratification date in order to decide whether the parties agreed to arbitrate Granite Rock’s no-strike claim or the ratification-date dispute Local raised as a defense to that claim.
Local seeks to address this flaw in the Court of Appeals’ decision by arguing that in December 2004 the parties exe *306 cuted a document that rendered the CBA effective as of May 1, 2004 (the date, the prior CBA expired), and that this effective-date language rendered the CBA’s arbitration clause (but not its no-strike clause) applicable to the July strike period notwithstanding Local’s view that the agreement was ratified in August (which ratification date Local continues to argue controls the period during which the no-strike clause applies). See Brief for Respondent Local, at 26-27; Tr. of Oral Arg. 32, 37-39. The Court of Appeals did not rule on the merits of this claim (i. e., it did not decide whether the CBA’s effective-date language indeed renders some or all of the agreement’s provisions retroactively applicable to May 2004), and we need not do so either. Even accepting Local’s assertion that it raised this retroactivity argument in the District Court, see Brief for Respondent Local, at 26,[13] Local did not raise this argument in the Court of Appeals. Nor, more importantly, did Local’s brief in opposition to Granite Rock’s petition for certiorari raise the argument as an alternative ground on which this Court could or should affirm the Court of Appeals’ judgment finding the ratification-date dispute arbitrable for the reasons discussed above. Accordingly, the argument is properly “deemed waived.” This Court’s Rule 15.2; Carcieri v. Salazar, 555 U. S. 379, 396 (2009).[14]
*307 c
Although the foregoing is sufficient to reverse the Court of Appeals’ judgment, there is an additional reason to do so: The dispute here, whether labeled a formation dispute or not, falls outside the scope of the parties’ arbitration clause on grounds the presumption favoring arbitration cannot cure. Section 20 of the CBA provides in relevant part that “[a]ll disputes arising under this agreement shall be resolved in accordance with the [Grievance] procedure,” which includes arbitration. App. 434 (emphasis added); see also id., at 434-437. The parties’ ratification-date dispute cannot properly be characterized as falling within the (relatively narrow, cf., e. g., Drake Bakeries Inc., 370 U. S., at 256-257) scope of this provision for at least two reasons. First, we do not think the question whether the CBA was validly ratified on July 2, 2004 — a question that concerns the CBA’s very existence— can fairly be said to “arise under” the CBA. Second, even if the “arising under” language could in isolation be construed to cover this dispute, § 20’s remaining provisions all but foreclose such a reading by describing that section’s arbitration requirement as applicable to labor disagreements that are addressed in the CBA and are subject to its requirement of mandatory mediation. See App. 434-437 (requiring arbitration of disputes “arising under” the CBA, but only after the union and employer have exhausted mandatory mediation, and limiting any arbitration decision under this provision to those “within the scope and terms of this agreement and . . . specifically limited to the matter submitted”).
The Court of Appeals’ contrary conclusion does not find support in the text of § 20. The Court of Appeals’ only effort to grapple with that text misses the point because it focuses on whether Granite Rock’s claim to enforce the *308 CBA’s no-strike provisions could be characterized as “arising under” the agreement. See 546 F. 3d, at 1177, n. 4. Even assuming that claim can be characterized as “arising under” the CBA, it is not the issue here. The issue is whether the formation-date defense that Local raised in response to Granite Rock’s no-strike suit can be characterized as “arising under” the CBA. It cannot for the reasons we have explained, namely, the CBA provision requiring arbitration of disputes “arising under” the CBA is not fairly read to include a dispute about when the CBA came into existence. The Court of Appeals erred in failing to address this question and holding instead that the arbitration clause is “susceptible of an interpretation” that covers Local’s formation-date defense to Granite Rock’s suit “[b]ecause Granite Rock is suing ‘under’ the alleged new CBA” and “[a]rbitration clauses are to be construed very broadly.” Ibid.; see also id., at 1178.
D
Local’s remaining argument in support of the Court of Appeals’ judgment is similarly unavailing. Local reiterates the Court of Appeals’ conclusion that Granite Rock “implicitly” consented to arbitration when it sued to enforce the CBA’s no-strike and arbitrable grievance provisions. See Brief for Respondent Local, at 17-18. We do not agree that by seeking an injunction against the strike so the parties could arbitrate the labor grievance that gave rise to it, Granite Rock also consented to arbitrate the ratification- (formation-) date dispute we address above. See 564 F. 3d, at 1178. It is of course true that when Granite Rock sought that injunction it viewed the CBA (and all of its provisions) as enforceable. But Granite Rock’s decision to sue for compliance with the CBA’s grievance procedures on strike-related matters does not establish an agreement, “implicit” or otherwise, to arbitrate an issue (the CBA’s formation date) that Granite Rock did not raise, and that Granite Rock has always (and rightly, see Part II-C, supra) characterized as beyond the scope of *309 the CBA’s arbitration clause. The mere fact that Local raised the formation-date dispute as a defense to Granite Rock’s suit does not make that dispute attributable to Granite Rock in the waiver or estoppel sense the Court of Appeals suggested, see 546 P. 3d, at 1178, much less establish that Granite Rock agreed to arbitrate it by suing to enforce the CBA as to other matters. Accordingly, we hold that the parties’ dispute over the CBA’s formation date was for the District Court, not an arbitrator, to resolve, and remand for proceedings consistent with that conclusion.
Ill
We turn now to the claims available on remand. The parties agree that Granite Rock can bring a breach-of-contract claim under LMRA § 301(a) against Local as a CBA signatory, and against IBT as Local’s agent or alter ego. See Brief for Respondent IBT 10-13; Reply Brief for Petitioner 12-13, and n. II.[15] The question is whether Granite Rock may also bring a federal tort claim under § 301(a) for IBT’s alleged interference with the CBA.[16] Brief for Peti *310 tioner 32. The Court of Appeals joined virtually all other Circuits in holding that it would not recognize such a claim under § 301(a).
Granite Rock asks us to reject this position as inconsistent with federal labor law’s goal of promoting industrial peace and economic stability through judicial enforcement of CBAs, as well as with our precedents holding that a federal common law of labor contracts is necessary to further this goal. See id., at 31; see also, e. g., Textile Workers v. Lincoln Mills of Ala., 353 U. S. 448, 451 (1957). Explaining that IBT’s conduct in this case undermines the very core of the bargaining relationship federal labor laws exist to protect, Granite Rock argues that a federal common-law tort remedy for IBT’s conduct is necessary because other potential avenues for deterring and redressing such conduct are either unavailable or insufficient. See Brief for Petitioner 32-33; Reply Brief for Petitioner 19-20. On the unavailable side of the ledger Granite Rock lists state-law tort claims, some of which this Court has held § 301(a) pre-empts, as well as administrative (unfair labor practices) claims, which Granite Rock says the National Labor Relations Board (NLRB) cannot entertain against international unions that (like IBT) are not part of the certified local bargaining unit they allegedly control. On the insufficient side of the ledger Granite Rock lists federal common-law breach-of-contract claims, which Granite Rock says are difficult to prove against non-CBA signatories like IBT because international unions structure their relationships with local unions in a way that makes agency or alter ego difficult to establish. Based on these assessments, Granite Rock suggests that this case presents us with the *311 choice of either recognizing the federal common-law tort claim Granite Rock seeks or sanctioning conduct inconsistent with federal labor statutes and our own precedents. See Brief for Petitioner 13-14.
We do not believe the choice is as stark as Granite Rock implies. It is of course true that we have construed “[election 301 [to] authoriz[e] federal courts to fashion a body of federal law for the enforcement of collective bargaining agreements.” Lewis v. Benedict Goal Corp., 361 U. S. 459, 470 (1960) (citing Lincoln Mills, supra). But we have also emphasized that in developing this common law we “did not envision any freewheeling inquiry into what the federal courts might find to be the most desirable rule.” Howard Johnson Co. v. Hotel Employees, 417 U. S. 249, 255 (1974). The balance federal statutes strike between employer and union relations in the collective-bargaining arena is carefully calibrated, see, e. g., NLRB v. Drivers, 362 U. S. 274, 289-290 (1960), and as the parties’ briefs illustrate, creating a federal common-law tort cause of action would require a host of policy choices that could easily upset this balance, see Brief for Respondent IBT 42-44; Reply Brief for Petitioner 22-25. It is thus no surprise that virtually all Courts of Appeals have held that federal courts’ authority to “create a federal common law of collective bargaining agreements under section 301” should be confined to “a common law of contracts, not a source of independent rights, let alone tort rights; for section 301 is ... a grant of jurisdiction only to enforce contracts.” Brazinski v. Amoco Petroleum Additives Co., 6 F. 3d 1176, 1180 (CA7 1993). We see no reason for a different result here because it would be premature to recognize the federal common-law tort Granite Rock requests in this case even assuming that § 301(a) authorizes us to do so.
In reaching this conclusion, we emphasize that the question before us is a narrow one. It is not whether the conduct Granite Rock challenges is remediable, but whether we should augment the claims already available to Granite Rock *312 by creating a new federal common-law cause of action under' § 301(a). That we decline to do so does not mean that we approve of IBT’s alleged actions. Granite Rock describes a course of conduct that does indeed seem to strike at the heart of the collective-bargaining process federal labor laws were designed to protect. As the record in this case demonstrates, however, a new federal tort claim is not the only possible remedy for this conduct. Granite Rock’s allegations have prompted favorable judgments not only from a federal jury, but also from the NLRB. In proceedings that predated those in which the District Court entered judgment for Granite Rock on the CBA’s formation date,[17] the NLRB concluded that a “complete agreement” was reached on July 2, and that Local and IBT violated federal labor laws by attempting to delay the CBA’s ratification pending execution of a separate agreement favorable to IBT. See In re Teamsters Local 287, 347 N. L. R. B. 339, 340-341, and n. 1 (2006) (applying the remedial order on the 2004 conduct to both Local and IBT on the grounds that IBT did not disaffiliate from the AFL-CIO until July 25, 2005).
These proceedings, and the proceedings that remain to be conducted on remand, buttress our conclusion that Granite Rock’s case for a new federal common-law cause of action is based on assumptions about the adequacy of other avenues of relief that are at least questionable because they have not been fully tested in this case and thus their efficacy is simply not before us to evaluate. Notably, Granite Rock (like IBT and the Court of Appeals) assumes that federal common law provides the only possible basis for the type of tort claim it wishes to pursue. See Brief for Respondent IBT 33-34; *313 Reply Brief for Petitioner 16. But Granite Rock did not litigate below, and thus does not present us with occasion to address, whether state law might provide a remedy. See, e. g., Steelworkers v. Rawson, 495 U. S. 362, 369-371 (1990); Textron Lycoming Reciprocating Engine Div., AVCO Corp. v. Automobile Workers, 523 U. S. 653, 656, 658 (1998). Nor did Granite Rock fully explore the breach-of-contract and administrative causes of action it suggests are insufficient to remedy IBT’s conduct. For example, far from establishing that an agency or alter ego claim against IBT would be unsuccessful, the record in this case suggests it might be easier to prove than usual if, as the NLRB’s decision observes, IBT and Local were affiliated in 2004 in a way relevant to Granite Rock’s claims. See In re Teamsters Local 287, supra, at 340, n. 6. Similarly, neither party has established that the NLRB itself could not issue additional relief against IBT. IBT’s amicus argues that the “overlap between Granite Rock’s § 301 claim against the IBT and the NLRB General Counsel’s unfair labor practice complaint against Local 287 brings into play the [National Labor Relations Act] rule that an international union commits an unfair labor practice by causing its affiliated local unions to 'impose extraneous non-bargaining unit considerations into the collective bargaining process.’” Brief for American Federation of Labor and Congress of Industrial Organizations 30-31 (quoting Paperworkers Local 620, 309 N. L. R. B. 44 (1992)). The fact that at least one Court of Appeals has recognized the viability of such a claim, see Kobell v. United Paperworkers Int’l Union, 965 F. 2d 1401, 1407-1409 (CA6 1992), further persuades us that Granite Rock’s arguments do not justify recognition of a new federal tort claim under § 301(a).
* * *
We reverse the Court of Appeals’ judgment on the arbitrability of the parties’ formation-date dispute, affirm its judgment dismissing Granite Rock’s claims against IBT to the *314 extent those claims depend on the creation of a new federal common-law tort cause of action under § 301(a), and remand the case for further proceedings consistent with this opinion.

It is so ordered.

 In deciding the arbitration question in this case we rely upon the terms of the CBA and the facts in the District Court record. In reviewing the judgment affirming dismissal of Granite Rock’s tort claims against respondent International Brotherhood of Teamsters (IBT) for failure to state a claim, we rely on the facts alleged in Granite Rock’s Third Amended Complaint. See, e. g., H. J. Inc. v. Northwestern Bell Telephone Co., 492 U. S. 229, 250 (1989).

 This Court has recognized a federal common-law claim for breach of a CBA under LMRA § 301(a). See, e. g., Textile Workers v. Lincoln Mills of Ala., 353 U. S. 448, 456 (1957).

 The CBA’s ratification date is important to Granite Rock’s underlying suit for strike damages. If the District Court correctly concluded that the CBA was ratified on July 2, Granite Rock could argue on remand that the July work stoppage violated the CBA’s no-strike clause.

 Although a union ratification vote is not always required for the provisions in a CBA to be considered validly formed, the parties agree that ratification was such a predicate here. See App. 349-351.

 Because neither party argues that the arbitrator should decide this question, there is no need to apply the rule requiring “ ‘clear and unmistakable’ ” evidence of an agreement to arbitrate arbitrability. First Options *298 of Chicago, Inc. v. Kaplan, 514 U. S. 938, 944 (1995) (quoting AT&T Technologies, Inc. v. Communications Workers, 475 U. S. 643, 649 (1986); alterations omitted).

 We, like the Court of Appeals, discuss precedents applying the FAA because they employ the same rules of arbitrability that govern labor cases. See, e. g., id., at 650. Indeed, the rule that arbitration is strictly a matter of consent — and thus that courts must typically decide any questions concerning the formation or scope of an arbitration agreement before ordering parties to comply with it — is the cornerstone of the framework the Court announced in the Steelworkers Trilogy for deciding arbitrability disputes in LMRA cases. See Steelworkers v. American Mfg. Co., 363 U. S. 564, 567-568 (1960); Steelworkers v. Warrior & Gulf Nav. Co., 363 U. S. 574, 582 (1960); Steelworkers v. Enterprise Wheel & Car Corp., 363 U. S. 593, 597 (1960).

 See also Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U. S. 52, 57 (1995); Dean Witter Reynolds Inc. v. Byrd, 470 U. S. 213, 219-220 (1985); Scherk v. Alberto-Culver Co., 417 U. S. 506, 511 (1974); AT&T Technologies, supra, at 648; Warrior & Gulf, supra, at 582; United States v. Moorman, 338 U. S. 457, 462 (1950).

 That our labor arbitration precedents apply this rule is hardly surprising. As noted above, see n. 6, swpra, the rule is the foundation for the arbitrability framework this Court announced in the Steelivorkers Trilogy. Local’s assertion that Warrior & Gulf suggests otherwise is misplaced. Although Warrior & Gulf contains language that might in isolation be misconstrued as establishing a presumption that labor disputes are arbi *302 trable whenever they are not expressly excluded from an arbitration clause, 363 U. S., at 578-582, the opinion elsewhere emphasizes that even in LMRA eases, “courts” must construe arbitration clauses because “a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit,” id., at 582 (applying this rule and finding the dispute at issue arbitrable only after determining that the parties’ arbitration clause could be construed under standard principles of contract interpretation to cover it).
Our use of the same rules in FAA eases is also unsurprising. The rules are suggested by the statute itself. Section 2 of the PAA requires courts to enforce valid and enforceable arbitration agreements according to their terms. And § 4 provides in pertinent part that where a party invokes the jurisdiction of a federal court over a matter that the court could adjudicate but for the presence of an arbitration clause, “[t]he court shall hear the parties” and “diree[t] the parties to proceed to arbitration in accordance with the terms of the agreement” except “[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue,” in which case “the court shall proceed summarily to the trial thereof.” 9U.S.C. §4.

 The parties’ dispute about the CBA’s ratification date presents a formation question in the sense above, and is therefore not on all fours with, for example, the formation disputes we referenced in Buckeye Check Cashing, Inc. v. Cardegna, 546 U. S. 440, 444, n. 1 (2006), which concerned whether, not when, an agreement to arbitrate was “concluded.” That said, the manner in which the CBA’s ratification date relates to Local’s arbitration demand makes the ratification-date dispute in this case one that requires judicial resolution. See infra, at 304-309.

 Our conclusions about the significance of the CBA’s ratification date to the specific arbitrability question before us do not disturb the general rule that parties may agree to arbitrate past disputes or future disputes based on past events.

 In reaching this conclusion we need not, and do not, decide whether every dispute over a CBA’s ratification date would require judicial resolution. We recognize that ratification disputes in labor cases may often qualify as “formation disputes” for contract law purposes because contract law defines formation as acceptance of an offer on specified terms, and in many labor eases ratification of a CBA is necessary to satisfy this formation requirement. See App. 349-351. But it is not the mere labeling of a dispute for contract law purposes that determines whether an issue is arbitrable. The test for arbitrability remains whether the parties consented to arbitrate the dispute in question.

 This analysis pertains only to the Court of Appeals’ decision, which did not engage the llth-hour retroactivity argument Local raised in its merits brief in this Court, and that we address below.

 This claim is questionable because Local’s February 2005 references to the agreement “now in effect” are not obviously equivalent to the express retroactivity argument Local asserts in its merits brief in this Court. See Brief for Respondent Local, at 26-27.

 Justice Sotomayor’s conclusion that we should nonetheless excuse Local’s waiver and consider the retroactivity argument, see post, at 318— 319 (opinion concurring in part and dissenting in part), is flawed. This Court’s Rule 15.2 reflects the fact that our adversarial system assigns both sides responsibility for framing the issues in a ease. The importance of enforcing the Rule is evident in cases where, as here, excusing a party’s noncomplianee with it would require this Court to decide, in the first instance, a question whose resolution could affect this and other cases in a manner that the district court and court of appeals did not have an oppor *307 tunity to consider, and that the parties’ arguments before this Court may not fully address.

 Although the parties concede the general availability of such a claim against IBT, they dispute whether Granite Rock abandoned its agency or alter ego allegations in the course of this litigation. Compare Brief for Respondent IBT 10 with Reply Brief for Petitioner 12-13, n. 11. Granite Rock concedes that it has abandoned its claim that IBT acted as Local’s undisclosed principal in orchestrating the ratification response to the July 2, 2004, CBA. See Plaintiff Granite Rock’s Memorandum of Points and Authorities in Opposition to Defendant IBT’s Motion To Dismiss in No. 5:04-ev-02767-JW (ND Cal., Aug. 7, 2006), Doe. 178, pp. 6, 8 (hereinafter Points and Authorities). But Granite Rock insists that it preserved its argument that Local served as IBT’s agent or alter ego when Local denied ratification and engaged in unauthorized strike activity in July 2004. Nothing in the record before us unequivocally refutes this assertion. See App. 306,311-315, 318; Points and Authorities 6, n. 3. Accordingly, nothing in this opinion forecloses the parties from litigating these claims on remand.

 IBT argues that we should dismiss this question as improvidently granted because Granite Rock abandoned its tortious interference claim when it declared its intention to seek only contractual (as opposed to puni *310 tive) damages on the claim. See Brief for Respondent IBT 16. We reject this argument, which confuses Granite Rock’s decision to forgo the pursuit of punitive damages on its claim with a decision to abandon , the claim itself. The two are not synonymous, and IBT cites no authority for the proposition that Granite Rock must allege more than economic damages to state a claim on which relief could be granted.

 Although the NLRB and federal jury reached different conclusions with respect to the CBA’s ratification date, the discrepancy has little practical significance because the NLRB’s remedial order against Local and IBT gives “retroactive effect to the terms of the [CBA of] July 2, 2004, as if ratified on that date.” In re Teamsters Local 287, 347 N. L. R. B. 339, 340 (2006).